# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SAMANTHA SOHMER and KATHY L. FELLGREN, Individually and on Behalf of All Others Similarly Situated, | Case No. 18-cv-03191 |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT** |
| UNITEDHEALTH GROUP INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, OPTUM, INC., and OPTUMRX, INC., | <u>**DEMAND FOR JURY TRIAL**</u> |
| Defendants. | |

Samantha Sohmer and Kathy L. Fellgren ("Plaintiffs"), by their undersigned attorneys, allege the following based upon their knowledge, the documents governing their welfare benefit plans, documents publicly filed by Defendants, the investigation conducted by their counsel, and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.     Plaintiffs, who received prescription drug benefits through group health plans ("Plans")[1] administered and managed by Defendants—UnitedHealth Group, Inc.

---

[1] Unless otherwise specified, the term "Plans" includes both (a) health plans insured and administered by Defendant UHC Insurance or its affiliates and (b) health plans funded by

("UnitedHealth"), United Healthcare Services, Inc. ("UHC Services"), United HealthCare Insurance Company ("UHC Insurance"), Optum, Inc., or OptumRx, Inc. (Optum, Inc. and OptumRx, Inc. are collectively referred to as "OptumRx")—allege that Defendants caused Plaintiffs to be overcharged for medically necessary prescription drugs in violation of their Plans.

2.      Plaintiffs bring this action, on behalf of themselves and two Classes of similarly situated persons, to remedy Defendants' common scheme to artificially inflate prescription drug costs. Plaintiff Sohmer, on behalf of the ERISA Class (defined below), alleges violations of the Employee Retirement Income Security Act of 1974 ("ERISA") [codified at 29 U.S.C. § 1001 *et seq.*]. Plaintiff Fellgren, on behalf of the Non-ERISA Class (defined below), alleges state law claims for breach of contract, breach of implied covenant of good faith and fair dealing, violations of the Minnesota Uniform Deceptive Trade Practices Act ("UDTPA"), and unjust enrichment.

3.      About 90 percent of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits. A feature of most of these plans is the shared cost of prescription drugs. Normally, when a patient[2] fills a prescription for a medically necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient

---

employers but administered by UHC Services or its affiliates. "Plans" includes both public and private plans and governmental program plans, such as Affordable Care Act, and Medicare Part D, Medicare Advantage, and PDP plans.

[2] The term "patient" refers to a plan participant or beneficiary under a health plan with prescription drug coverage administered by Defendants who purchases prescription drugs pursuant to that Plan.

pays the remaining portion of the cost (i.e., a "cost share") directly to the pharmacy in the form of a copayment (often a set dollar amount), coinsurance (often a percentage of the contracted rate), or deductible payment. Defendants directed the pharmacies to collect these cost-sharing payments on Defendants' behalf from patients at the time the prescription is filled. Pharmacies are not allowed to waive or reduce the amount collected under the plans.

4.      Defendants administer health and pharmacy benefits provided to patients. Defendant OptumRx, a wholly owned subsidiary of UnitedHealth Group, serves as the prescription benefits manager ("PBM") to UnitedHealthcare members. PBM services include, *inter alia*: participating in managing a network of pharmacies that will serve as participating pharmacies at which Defendants' patients obtain prescriptions; working with the other Defendants to set and dictate copayment amounts, coinsurance amounts, and deductibles (if applicable) to pharmacies; and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

5.      As set forth below, Defendants have engaged in a scheme to overcharge patients for the cost of medically necessary prescription drugs. Patients, including Plaintiffs and the members of the Classes ("Class Members"), paid excessive charges to participating pharmacies for prescription drugs. Under their Plans, Plaintiffs' and the Class Members' cost-sharing amounts were limited to the amount paid to the pharmacy for prescription drugs. Unbeknownst to Plaintiffs and the Class Members, Defendants forced the pharmacies to misrepresent the cost-sharing amounts for prescription drugs and charge Plaintiffs and Class Members excessive amounts and forced patients to pay

excessive cost-sharing amounts. Plaintiffs paid copayments and coinsurance in excess of the cash price for their prescriptions. These excessive payments by patients were then collected by the pharmacies and "clawed back" from the pharmacies by Defendants. This is not a matter of mistaken or innocently erroneous calculations: it is a pervasive, intentional scheme by Defendants to overcharge Plaintiffs and everyone similarly situated in connection with their prescription drug purchases.

6.      For example, as detailed below, the express language of the Plans promised that Plaintiffs and Class Members would not pay more for prescription drugs than Defendants agreed to pay the network pharmacy. In violation of this Plan provision, Defendants required network pharmacies to charge Plaintiffs and Class Members unauthorized and excessive cost-sharing amounts for prescription drugs that were not based on the amount paid to the pharmacies ("Overcharges").

7.      Such Overcharges occurred in two ways. With respect to copayments or deductible payments, Defendants caused Plaintiffs and Class Members to pay cost shares that exceeded the amount that Defendants agreed to pay the pharmacy. With respect to coinsurance payments, Defendants caused Class Members to pay cost shares that exceeded the product of the applicable coinsurance percentage rate multiplied by the amount that Defendants agreed to pay the pharmacy.

8.      Moreover, Defendants profited from their scheme by "clawing back" some or all of these Overcharges by requiring the pharmacies to pay or credit the Overcharges to Defendants after the pharmacies collected the Overcharges from Plaintiffs and Class Members or by paying pharmacies less than they would have had they followed the Plans.

- 4 -

9.      For example, on October 24, 2016, Defendants unilaterally determined that Plaintiff Sohmer had to pay a $15 copayment to a pharmacy to purchase a prescription drug and required the pharmacy to collect this amount from Plaintiff Sohmer. Unknown to Plaintiff Sohmer, the $15 copayment Defendants required the pharmacy to collect from her was *almost double the contracted fee* the pharmacy was paid to fill the prescription. Specifically, on information and belief, Defendants' contract with the pharmacy provided that the pharmacy would be paid only $7.66 for the prescription. But, Defendants unilaterally directed and required the pharmacy to charge and collect the $15 copayment from Plaintiff Sohmer, thereby forcing Plaintiff Sohmer to pay not only the $7.66 contracted cost of the drug, but an additional $7.34. When, like in this example, the cost-share ($15) exceeds the amount paid to the pharmacy ($7.66), the $7.34 difference is the "Spread."[3]

10.     Plaintiff Fellgren was also subject to Overcharges. For example, she purchased the same drug six times in 2016, paying only $1.61 (the amount Defendants agreed to pay the pharmacy) for each of the first four purchases. However, for her last two purchases in 2016—once she was no longer in the deductible phase of her prescription drug coverage—Plaintiff Fellgren began paying a $10 copayment per prescription for the exact same drug. This allowed Defendants to claw back $8.39 for each purchase, or *over five times* what appears to be the pharmacy's payment amount.

---

[3] While the Overcharge equals the Spread under a Plan that provides for copayments, with a coinsurance Plan which, for example, provides for 20 percent coinsurance, a plaintiff may be overcharged by paying a percentage of an inflated amount.

11.     Upon information and belief, Defendants initially allowed pharmacies to keep Spread and other Overcharges. However, at some point during the Class Period, Defendants began requiring the pharmacies to turn over (or credit) the Spread to Defendants, which payment from the pharmacy to the Defendants is known as a "Clawback."  Regardless of whether there is a Clawback, Spread-pricing is unlawful under the Plans.

12.     These example transactions are not unusual. On information and belief, Defendants systematically instructed pharmacies to charge cost-sharing payments that exceeded the amounts that they have contractually agreed that pharmacies would be paid for drugs and then instructed the pharmacies to remit the Clawbacks to Defendants for their own accounts.

13.     Had Defendants lived up to their legal obligations under the Plans, Plaintiffs and Class Members would not have paid more than the amount the pharmacy agreed to be paid by Defendants for prescription drugs. Defendants should have and easily could have complied with the terms of the Plans and determined that the pharmacy should charge and collect only the amount that the pharmacy would receive for filling the prescription. Instead, Defendants imposed significant mark-ups—for example, $7.34 more than Plaintiff Sohmer's rightful $7.66 fee and $8.39 more than Plaintiff Fellgren's rightful $1.61 fee—and required the pharmacy to collect that excessive amount from Plaintiffs and Class Members.

14.     Defendants violated the Plan by secretly determining that patients must pay inflated copayments, coinsurance, and deductible payments and then directing pharmacies

to collect those inflated copayments, coinsurance, and deductible payments on their behalf (which Overcharges were then either retained by the pharmacies or remitted to Defendants in the form of Clawbacks).

15.     Defendants misrepresented to Plaintiffs and Class Members the cost-sharing amounts under the Plans and that their cost-sharing amounts were based on the amount that the pharmacy agreed to accept for the drugs, when, in fact, patients were charged and paid more than that amount and were charged based on inflated "costs."

16.     In order to implement Defendants' Overcharge scheme, Defendants', including Optum, entered into contracts with participating pharmacies that required the pharmacies not to disclose the existence of the Overcharges or Clawbacks, or the fact that a patient could, in certain circumstances, pay less for a prescription drug than if the patient did not use a Defendant-administered Plan or did not have any insurance at all. As a result of these "gag clauses," the Overcharges remain hidden from participants and beneficiaries.

17.     Defendants' scheme to artificially inflate the costs for medically necessary prescription drugs by overcharging patients, and then to surreptitiously require pharmacies to collect Overcharges or to take Clawbacks is inconsistent with the purposes of the health care system and the express terms of the Plans. For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts. Patients are supposed to save money through the use of pharmacy benefits, but in reality, they are charged excessive amounts.

18.     Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to benefit from the administrator's and

PBM's negotiating and buying power with prescription drug manufacturers and pharmacies. This should result in *reduced* costs for prescription drugs. Patients and Plans also pay substantial costs and fees, which should cover the other aspects of the prescription drug plans, including their administration. Moreover, PBMs and Plan providers such as Defendants are paid significant fees as compensation for their services that are entirely separate from the Clawbacks, making the Clawbacks excess, undisclosed profit in exchange for little to nothing. Accordingly, Plaintiffs and Class Members should not have been charged additional secret Overcharges and Clawbacks.

19.     As a result of Defendants' scheme to collect Overcharges, Defendants overcharged Plaintiffs and Class Members for prescription drugs during the Class Period (defined below). Defendants' misconduct has caused Plaintiffs and Class Members to suffer significant damages.

20.     As further alleged below, Plaintiffs seek to represent two Classes of Plan participants and beneficiaries whose health Plans are issued or administered by Defendants: (1) the ERISA Class; and (2) the Non-ERISA Class.

21.     Plaintiffs seek relief on behalf of themselves and the members of these two Classes by bringing the following claims:

(a)     Count I:  Plaintiff Sohmer brings a claim, on behalf of the ERISA Class, under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B),[4] to recover benefits due to her under the terms of the Plans, to enforce her rights and the rights of ERISA Class

---

[4] Parallel citations to sections of (a) the Act and (b) the U.S. Code are provided herein as follows: "ERISA § __, 29 U.S.C. § __."

Members under the terms of the Plans, or to clarify her rights and the rights of ERISA Class Members to future benefits under the terms of the Plan.

(b)      Count II:  Plaintiff Fellgren brings a claim, on behalf of the Non-ERISA Class, alleging that Defendant UHC Services has breached its contracts with her and the Non-ERISA Class Members in requiring them to pay fees for prescriptions drugs in excess of the fees authorized in the Plans, including Overcharges and Spread.

(c)      Count III: Plaintiff Fellgren brings a claim, on behalf of the Non-ERISA Class, alleging that Defendant UHC Services has breached its implied covenant of good faith and fair dealing in requiring Plaintiff Fellgren and the Non-ERISA Class Members to pay Overcharges. Defendant UHC Services' actions were performed in bad faith, with the intent of maximizing its own revenue at participants' expense, in contravention of the reasonable expectations of Plaintiff Fellgren and the Non-ERISA Class Members.

(d)      Count IV: Plaintiff Fellgren further brings a claim, on behalf of the Non-ERISA Class, alleging that Defendants' conduct violated the Minnesota Uniform Deceptive Trade Practices Act, and seeking an order enjoining Defendants from continuing to conduct business through their fraudulent conduct, requiring Defendants to conduct a corrective advertising campaign, and awarding Plaintiff Fellgren and the Non-ERISA Class costs, including reasonable attorney's fees.

(e)      Count IV: Plaintiff Fellgren further alleges, on behalf of the Non-ERISA Class, that Defendants were unjustly enriched as a result of the conduct alleged

herein and that they must make restitution and restore to her and the Non-ERISA Class the amount of the Overcharges.

## JURISDICTION

22.    **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 28 U.S.C. § 1332(a) and (d), which provides for federal jurisdiction over cases involving parties who have diverse citizenship and the amount in controversy exceeds $75,000 or $5 million, respectively.

23.    **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Minnesota. Defendants may be found in this District and conduct substantial business herein: Defendants are authorized to do business in the State of Minnesota; Defendants conduct business in the State of Minnesota; Defendants have sufficient minimum contacts with the State of Minnesota; Defendants administer health plans from the State Minnesota; and/or Defendants otherwise intentionally avail themselves of the markets in the State of Minnesota through the marketing and sale of health care related services in this State so as to render the

- 10 -

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendants' acts, practices and policies pertaining to the Overcharges or Clawbacks were established in and emanated from Minnesota. Further, Defendants' wrongful conduct, as described herein, foreseeably affects consumers in Minnesota and throughout the United States.

24.     **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred within this District. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District.

## THE PARTIES

25.     Plaintiff Samantha Sohmer is a citizen of New Jersey. Plaintiff Sohmer received prescription drug coverage under a "Choice Plus Plan A" group Plan purchased through her employer for her benefit. This Plan is a welfare benefit plan subject to ERISA. The Plan was serviced and administered by Defendant UHC Services. Under the Plan, Plaintiff Sohmer was obligated to pay copayments of $15-$175 for prescription drugs. On numerous occasions detailed below, Plaintiff Sohmer was charged a copay in an amount that exceeded the amount the Defendants agreed to pay the pharmacy (*i.e.*, the "Negotiated Price," defined below). As a result of Defendants' scheme, Plaintiff Sohmer has been injured by paying inflated amounts for medically necessary, covered prescription drugs.

26.     Plaintiff Kathy L. Fellgren is a Florida citizen and was a participant in the School District of Escambia County, Florida Choice HRA Base Plan with Medical and

Pharmacy coverage. The Plan was administered by Defendant UHC Services. Under her Plan, Plaintiff Fellgren was obligated to pay copayments of $10, $30, or $70. On numerous occasions detailed below, Plaintiff Fellgren was charged a copay in an amount that exceeded the amount the pharmacy agreed to pay. As a result of Defendants' scheme, Plaintiff Fellgren has been injured by paying inflated copays for medically necessary, covered prescription drugs.

27.     Defendant UnitedHealth is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. UnitedHealth is a diversified managed healthcare company. In 2017, UnitedHealth reported revenue in excess of $201 billion, and the company is currently ranked sixth on the Fortune 500 list. The company claims that in 2017, through its UnitedHealthcare entities and its wholly-owned subsidiary OptumRx, it processed nearly three-quarters of a trillion dollars in gross billed charges and managed nearly $250 billion in aggregate health care spending on behalf of the customers and consumers it serves. UnitedHealth offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

28.     Defendant UHC Services is a Minnesota corporation. UHC Services provides health insurance plans for employers, individuals, and families throughout the United States, and manages and administers both ERISA Plans and Non-ERISA Plans, including Medicare Advantage Plans. UHC Services administered Plaintiffs Sohmer and Fellgren's Plans.

29.     Defendant UHC Insurance operates as a subsidiary of UHIC Holdings, Inc., which is a subsidiary of UHC Services. UHC Insurance is a corporation organized under the laws of Connecticut with a principal place of business in Hartford, Connecticut. UHC Insurance contracts on behalf of itself and its affiliates for the payment of healthcare services provided to a participating provider's patients. UHC Insurance is the primary underwriter of insurance policies provided and administered by UHC Services and its state-level subsidiaries and affiliates.

30.     Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Optum, Inc. is a subsidiary of United HealthCare Services and manages the subsidiaries that administer UnitedHealth's pharmacy benefits, including OptumRx, Inc.

31.     Defendant OptumRx, Inc. is a California corporation with its principal place of business in Irvine, California. OptumRx, Inc. provides pharmacy care services to more than 65 million people in the United States through its network of more than 67,000 retail pharmacies, multiple home delivery and specialty pharmacies and through the provision of home infusion services. In 2017, OptumRx, Inc. managed approximately $85 billion in pharmaceutical spending, including $35 billion in specialty pharmaceutical spending.

## SUBSTANTIVE ALLEGATIONS

### Health Insurance in the United States

32.     Over 90 percent of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

33.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period, through employer plans that either provide benefits by purchasing group insurance policies, or are self-funded but administered by health insurance companies and their affiliates. Premiums and contributions for coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers, or other institutions.

34.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is typically shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments, and copayments. In general, deductibles—to the extent they apply to prescription drug benefits—are the dollar amounts a patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs. Coinsurance generally requires a patient to pay a stated percentage of drug costs. Copayments are payments made by a patient toward the cost of a prescription drug and often are either set dollar amounts (*e.g.*, $10 or $15) or the actual pharmacy charge for the drug.

**The Pharmaceutical Benefits Industry and Pharmacy Benefits Managers**

35.     The pharmacy benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

36.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy.

Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer. The retail pharmacy then distributes drugs to patients from its inventory. Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs by the retail pharmacies, although PBMs may operate mail-order pharmacy businesses.

37.    The retail payment side of the market for drugs is largely directed and controlled by insurance companies and their contracted or owned PBMs. In most instances where a health plan provides for prescription drug benefits, a PBM is the agent of the insurer/administrator hired to participate in administering the prescription drug component of a health plan. For example, Optum acted as the United Defendants' delegee in participating in administering prescription drug plans during the Class Period.

38.    PBMs like Optum reach contractual agreements with retail pharmacies regarding the total prices pharmacies will receive (the combined amounts paid by patients and their Plans) for drugs processed through the PBM, typically a percentage of an industry-standard pricing benchmark ("Negotiated Price").

39.    When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is input into the pharmacy computer and transmitted via interstate wire to a "switch" that then directs the information to the correct PBM. Accordingly, the pharmacy instantaneously submits the claim to Defendants on behalf of the patient. The prescription is supposed to be processed by the PBM in accordance with a patient's Plan including terms related to the amount of cost-sharing payments a patient must pay in exchange for the prescription benefit, which, as

- 15 -

alleged herein, did not occur. The PBM then electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the cost-sharing amount the pharmacy must charge to and collect from the patient as a copayment, coinsurance, or the amount to be paid toward a deductible.

40.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy above and beyond the cost sharing payment (whether a copayment, coinsurance or deductible amount paid by the patient), to total the Negotiated Price. These amounts are aggregated and supposed to be paid to the pharmacy approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

41.     Under Defendants' scheme, if the patient's cost-sharing payment is greater than the amount the pharmacy has agreed to accept, there will be a "negative reimbursement" to the pharmacy for the difference between the patient's payment and the amount the pharmacy receives. The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

### The Relevant Contractual Relationships

42.     Contractual relationships exist at three relevant levels: (1) between the employer (or, in the case of non-employer sponsored Plans, the individual) and the company that underwrites and/or administers the Plan; (2) between the insurer/administrator and the PBM; and (3) between the PBM and retail pharmacies. An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a health insurance company to provide prescription drug benefits for its employees under health plans. Health insurance companies hire PBMs to

manage the prescription drug benefits offered pursuant to their policies and administrative services only ("ASO") contracts. PBMs like Optum then have relationships with retail pharmacies, which govern, among other things, the Negotiated Prices that the pharmacies will be paid in exchange for drug purchases processed through the PBMs. Some pharmacies may be "in-network" and others may be "out of network."

43.     The following diagram represents (in simplified form) the contractual relationships among the parties:



44.     **Employer/Individual–Insurer/Administrator Agreements (*i.e.*, Health Plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These Plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain prescription drug benefits. Plaintiffs and the Class Members are intended beneficiaries of such agreements and they are participants and beneficiaries in the Plans.

45.     **Insurer–PBM Agreements**. Health insurance/administration companies, such as the United Defendants, contract with and/or own PBMs such as Optum, which act as their agents in administering the prescription drug benefits purchased through the health plans that the insurers issue or administer.

46.    **PBM–Pharmacy Agreements**. For "in-network" benefits at issue in this case, PBMs like Defendant Optum contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network. Pursuant to these agreements, the pharmacies fill prescriptions that are health benefits covered under the Plans in exchange for an amount pursuant to the contract with the PBM (the Negotiated Prices). Pursuant to these agreements, the pharmacy submits a claim to Optum on behalf of the patient. In response to this claim, pursuant to these agreements, Defendants dictate the cost-sharing amount that a pharmacy must charge and collect from a patient for a prescription drug, including the Overcharge, the amount the pharmacy will be paid for filling the patient's prescription, and the amount of the patient's payment that the pharmacy must send back to Defendants as a Clawback. The pharmacy has no role in setting the amount of the patient's payment or Overcharge and thus must collect and remit to Defendants the amount overcharged as determined by Defendants.

47.    The relationship among the parties is shown graphically as follows:



48.     Pursuant to the health plans, an insurer must ensure that, when it contracts with and directs a PBM to act as its agent to manage prescription drug benefits, the PBM follows the Plans' terms, including when dictating to pharmacies the amounts to charge patients in cost-sharing payments. In other words, insurers and administrators must ensure that PBMs do not overcharge patients for their prescription drug benefits.

49.     On the contrary, PBMs, like Defendant Optum, acting as agents and/or in concert with the United Defendants, routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the Plans. As alleged herein, Defendants engaged in such practices with respect to Plaintiffs' Plans and the Classes by charging Overcharges.

### The Plans

50.     Defendant UHC Services was the "Claims Administrator" for Plaintiff Sohmer's 2012-2015 and 2016 Plans. It had the responsibility "to handle the day-to-day administration of the Plan's coverage as directed by the Plan's Administrator, through an administrative agreement" between the Plan sponsor and UHC Services.

51.     Defendant UHC Services was the "Claims Administrator" for Plaintiff Fellgren's self-funded employee health benefit plan in effect as of 2013. UHC Services "provide[d] certain claim administration services for the Plan," including prescription drug benefit claims.

52.     As Plan administrators, the United Defendants and their PBM designee, Defendant Optum, had a number of responsibilities. In particular, they arranged for healthcare providers, including pharmacies, to participate in their network. Network

pharmacies contracted with Defendants, or their designees and affiliates, to provide

"Prescription Drugs Products" to Plaintiffs.

53.     According to the Plans, the United Defendants had the option to retain and

utilize their affiliates to provide claims administration services. Affiliates "are those

entities affiliated with the Claims Administrator through common ownership or control

with the Claims Administrator or with the Claims Administrator's ultimate corporate

parent, including direct and indirect subsidiaries."

54.     UnitedHealth and UHC Services designated Defendant OptumRx to

participate in providing prescription drug products to Plaintiffs under their Plans,

including arranging for and managing the prescription drug network and managing and

processing prescription drug claims on the United Defendants' behalf.

55.     Plaintiffs' Plans utilized a "lower of three" formula for determining the

amount Plaintiffs pay for prescription drugs. Under these Plans, Plaintiffs were

responsible for paying the lower of (1) the applicable copayment, (2) the network

pharmacy's usual and customary charge, *i.e.*, the amount charged to a patient without

insurance, or (3) the "Prescription Drug Charge," defined as the rate that Defendants

agreed to pay the network pharmacy, including any applicable dispensing fee and taxes

("the Negotiated Price"). Under the "lowest of three" Plans, Plaintiffs should never pay

more than the Negotiated Price.

56.     Coinsurance plans define "coinsurance" as "the percentage of Eligible

Expenses [participants] are required to pay for certain covered health services" and define

"Eligible Expenses" as "charges for Covered Health Services that are provided while the

Plan is in effect and determined by the Claim's Administrator." With respect to network providers, "Eligible Expenses" are based on the "contracted rates with the provider." Accordingly, the cost-share of a participant in a coinsurance plan for prescription drugs should not exceed the product of the coinsurance rate (*i.e.*, 20 percent) and the amount that Defendants agreed to pay the network pharmacy.

### Defendants' Plans Have Standard Terms

57.     Defendants use uniform prescription drug plan terms in their Plan contracts to provide prescription drug coverage. These terms of the Plans—and more importantly how these Plans are administered and managed by Defendants—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all Class Members, regardless of the funding arrangement underpinning the health plan benefits that Defendants offer and administer.

### Plaintiffs' Purchases

58.     During the time that Plaintiff Sohmer was covered by the Plans, she purchased prescription drugs for which she was required to make copayments in excess of the amounts provided for by her Plans, including, for example, the following specific purchases:

| Filled Date | Amount UnitedHealth agreed to pay pharmacy | Amount Sohmer paid | Overcharge |
|---|---|---|---|
| 01/16/16 | $7.66 | $15.00 | $7.34 |
| 01/20/16 | $8.45 | $15.00 | $6.55 |
| 01/20/16 | $8.45 | $15.00 | $6.55 |
| 02/10/16 | $8.35 | $15.00 | $6.65 |

| 02/10/16 | $8.35 | $15.00 | $6.65 |
|----------|-------|--------|-------|
| 02/14/16 | $7.66 | $15.00 | $7.34 |
| 03/23/16 | $7.66 | $15.00 | $7.34 |
| 04/24/16 | $7.66 | $15.00 | $7.34 |
| 05/05/16 | $2.49 | $5.09 | $2.60 |
| 05/23/16 | $7.66 | $15.00 | $7.34 |
| 06/20/16 | $7.66 | $15.00 | $7.34 |
| 07/15/16 | $7.57 | $15.00 | $7.43 |
| 07/17/16 | $7.66 | $15.00 | $7.34 |
| 08/22/16 | $7.66 | $15.00 | $7.34 |
| 08/22/16 | $7.57 | $15.00 | $7.43 |
| 09/20/16 | $7.66 | $15.00 | $7.34 |
| 10/11/16 | $7.57 | $15.00 | $7.43 |
| 10/24/16 | $7.66 | $15.00 | $7.34 |
| 10/24/16 | $10.64 | $15.00 | $4.36 |
| 11/16/16 | $7.66 | $15.00 | $7.34 |
| 12/21/16 | $7.66 | $15.00 | $7.34 |

59.     Plaintiff Sohmer was illegally charged Overcharges for these prescription drugs in excess of the Negotiated Price. During this timeframe, Defendants then "clawed back" these Overcharges from Plaintiff Sohmer's pharmacy for their benefit.

60.     Plaintiff Fellgren was also subject to multiple Overcharges. For example, in 2016, she purchased the same prescription drug six times, and was Overcharged for the drug on her last two purchases.

61.     Under Plaintiff Fellgren's Plan, there was a $200 annual prescription drug deductible. During the deductible phase, patients paid "Eligible Expenses," defined as the "contracted rates with th[e] provider." In other words, during the deductible phase, Plaintiff Fellgren was obligated to pay the Negotiated Price until she reached $200 in out-of-pocket expenses. At that point, she was eligible for benefits under her "lowest of three"

formula, and she should still have paid no more than the Negotiated Price for a prescription drug.

62.    That did not happen, however. During the deductible phase, Plaintiff Fellgren paid $1.61 per prescription for this particular prescription drug. In September of 2016, Plaintiff Fellgren met her $200 prescription drug deductible. Then, in October and December of 2016, she paid a $10 copayment per prescription — over *five times* the Negotiated Price:

| Filled Date | Approved Ingredient Cost | Approved Dispensing Fee | Amount UnitedHealth agreed to pay pharmacy | Amount Fellgren paid |
|---|---|---|---|---|
| 02/17/16 | $0.61 | $1.00 | $1.61 | $1.61 |
| 06/08/16 | $0.61 | $1.00 | $1.61 | $1.61 |
| 07/07/16 | $0.61 | $1.00 | $1.61 | $1.61 |
| 09/06/16 | $0.61 | $1.00 | $1.61 | $1.61 |
| 10/07/16 | $9.00 | $1.00 | $10.00 | $10.00 |
| 12/23/16 | $9.00 | $1.00 | $10.00 | $10.00 |

63.    Plaintiff Fellgren's Plan entitled her to pay the *lowest of* (A) the applicable copayment ($10), (B) the usual and customary charge, or (C) the Prescription Drug Charge ($1.61). In violation of the Plan, Defendants required the pharmacy to collect a $10 copayment from her.

### Administrative Exhaustion Confirms Overcharges

64.    On January 16, 2018, Plaintiffs' counsel sent Defendants a letter requesting administrative review of their Overcharge claims including claims of former-plaintiff Stephen Hawks. On March 7, 2018, Defendants issued an initial decision denying

Plaintiffs' claims. Notably, the March 7 letter makes clear that Defendants patently misread Plaintiff Fellgren's Plan, calling it a "lessor [sic] of two" plan, when it was actually a "lowest of three" plan. Similarly, Plaintiff Sohmer's 2016 Plan—also a "lowest of three" plan—was ignored and treated as a "lessor [sic] of two" plan.

65.     On March 12, 2018, Plaintiffs requested a first level appeal, maintaining their position that they paid Overcharges in violation of their Plans. The March 12 letter made clear that Plaintiffs sought to appeal Defendants' initial determination for multiple years of claims, regardless of whether Defendants chose to provide claims data to Plaintiffs for all relevant transactions.

66.     Defendants denied Plaintiff Sohmer's first level appeal, stating that she was not entitled to reversal of her transactions because she had a "lower of two" Plan. Again, Defendants did not acknowledge that Plaintiff Sohmer's 2016 Plan was a "lowest of three" Plan. Defendants informed Plaintiff Sohmer that she could request a second level review if she was not satisfied with the outcome of her first level appeal.

67.     Defendants denied Plaintiff Fellgren's first level appeal, again erroneously stating that she was not entitled to reversal of her transactions because she had a "lower of two" Plan. In fact, as discussed above, Plaintiff Fellgren's Plan was a "lowest of three" Plan. Defendants informed Plaintiff Fellgren that she could request a second level review if she was not satisfied with the outcome of her first level appeal.

68.     In contrast, Defendants partially granted former-plaintiff Hawks's first level appeal. Defendants determined that Plaintiff Hawks *had been overcharged* with respect to seven of his 2015 transactions, when he had a "lowest of three" Plan, stating: "Hawks

actually paid the relevant member responsibility amount, which was more than the

contract price negotiated with the individual pharmacy." Defendants thus admitted that

they had engaged in improper Overcharges and Clawbacks as to at least some of Hawks's

transactions, as evidenced by the check they issued to reimburse him for the Overcharges.

69.     On April 24, 2018, Plaintiffs requested a second level appeal of their

administrative claims.

70.     Plaintiff Sohmer's second level appeal was denied by letter on May 24,

2018, with Defendants affirming their previous determination that she was not entitled to

reversal of any of her transactions and notifying her that she has the right to pursue a

claim under ERISA § 502(a)(1)(B).

71.     Plaintiff Fellgren's second level appeal likewise was denied by letter on

May 24, 2018, with Defendants once again erroneously stating that she had a "lessor [sic]

of two" plan and thus was not entitled to reversal of her transactions. She was informed of

a right to sue if not satisfied with the result.[5]

72.     Although Defendants admitted wrongdoing in reversing former-plaintiff

Hawks's Overcharges, they have not done so uniformly, even as to the named Plaintiffs.

First, despite the fact that Hawks has the *same Plan language* as Plaintiffs Sohmer and

Fellgren, and despite the fact that the transaction data for Plaintiffs Sohmer and Fellgren

---

[5] As further evidence of Defendants' lack of care in handling claims and appeals and communicating fully and accurately with plan participants, the May 24, 2018 letter misinformed Plaintiff Fellgren that she had a right to sue under ERISA § 502(a)(1)(B), but her Plan is not governed by ERISA because it is a governmental plan excepted by ERISA § 4(b)(1), 29 U.S.C. § 1003(b)(1).

shows that they too paid more than the Negotiated Price on multiple occasions,

Defendants denied Plaintiff Sohmer's and Plaintiff Fellgren's administrative appeals in

their entireties.

### Patients Covered By Defendants' Health Plans Pay Undisclosed, Unauthorized and Excessive Fees for Prescription Drugs

73.     Defendants have engaged in a scheme to charge Plaintiffs and other

patients Overcharges in violation of the Plans as alleged above. This is particularly true

for many low-cost, high-volume generic prescription drugs.

74.     Defendants utilize technology and service platforms, retail network

contracting and claims processing services to carry out this Overcharge and Clawback

Scheme, including those of Defendant OptumRx.

75.     Defendant OptumRx's Provider Manual[6] explains the mechanism by which

Defendants conducted the scheme:

(a)     The Provider Manual "includes the policies and procedures"

applicable to all pharmacies participating in OptumRx's pharmacy network and "is

incorporated into and is a part of" the pharmacies' agreements with Defendants (through

OptumRx).[7]

(b)     The Provider Manual provides that  OptumRx "shall communicate to

[pharmacies] (via the POS System) the Cost-Sharing Amounts (*e.g.*, Co-payment and

---

[6]   OptumRx Provider Manual (2d ed. 2016) ("Provider Manual"), available at: https://www.optum.com/content/dam/Optum/resources/publications/Quarter2-4.1.16-ORX5979A_160315_OptumRx2016PharmacyManual_FINAL.pdf.
[7]   *Id.* at 3.

Deductible) applicable to Covered Prescription Services."[8]  OptumRx directs that

pharmacies "shall collect the full Cost-Sharing Amounts" from Plaintiffs and the Class

Members purchasing medically necessary prescription drugs.[9] OptumRx directs that

pharmacies "must charge . . . the Cost-Sharing Amount indicated in [Defendants'] online

response and only this amount."[10] OptumRx dictates that waiving the Cost-Sharing

Amount by pharmacies is "strictly prohibited . . . and is considered a material breach of

the Agreement."[11]

     (c)     The Provider Manual provides that "reimbursement pricing

information, as well as prices paid to [pharmacies] . . . are "confidential and proprietary. . .

."[12]

     (d)     The Provider Manual provides that "[f]ailure to adhere to any of the

provisions . . . which includes this [Provider Manual] . . . will be viewed as a breach of the

Agreement."[13] Pharmacies are "subject to penalties or sanctions" if OptumRx determines

that the pharmacies "disclosed confidential information. . . ."[14] These penalties include "at

a minimum . . . $5,000 per incident," and pharmacies "may be subject to additional

actions" by OptumRx, "up to termination from participation" in OptumRx's pharmacy

network.[15] Pharmacies terminated from participation in the pharmacy network are banned

---

[8]  *Id.* at 13.
[9]  *Id.*
[10] *Id.* at 54.
[11] *Id.*
[12] *Id.* at 54.
[13] *Id.* at 3.
[14] *Id.* at 40.
[15] *Id.*

from the pharmacy network for five years and, only after such a period, may apply for reinstatement at Optum's "sole discretion."[16]

76.     Defendants used the OptumRx platforms to create and implement their unlawful Overcharge Scheme. Defendants programmed and manipulated the OptumRx technology and service platforms to violate the Plans' terms and charge greater Cost-Sharing Amounts than the Plans permitted, and they inputted the excessive and unlawful cost-sharing data into the platform system to enable the system to overcharge patients.

77.     Defendants further manipulated the systems to misrepresent to patients the "Cost-Sharing Amounts (*e.g.*, Co-payment, Coinsurance and Deductible) applicable to Covered Prescription Services" that were inflated, false and in violation of the Plans. Defendants required the pharmacies to make these misrepresentations to Plaintiffs and other patients when they filled their prescriptions. For example, Defendants made these misrepresentations to Plaintiffs each time they filled a prescription and were advised of and required to pay an excessive copayment and Spread as alleged above.

78.     Defendants further directed that pharmacies "shall collect the full [inflated and unlawful] Cost-Sharing Amounts" from patients.[17] Defendants required that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [Optum's] online response and only this amount,"[18] which included the excessive and unlawful Overcharges in violation of the Plans that Defendants improperly inputted into the system.

---

[16] *Id.* at 97.
[17] *Id.* at 13.
[18] *Id.* at 54.

79.     Where the patient pays a deductible and/or coinsurance (as opposed to a copayment), the patient is overcharged because his or her payment is based on the inflated amount, ***not*** the lower amount paid to the pharmacy. Defendants implemented the scheme concerning these types of cost-sharing in the same way they executed the scheme concerning copayments.

80.     Defendants' Overcharge Scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the misrepresentation in the Plans that Plaintiffs would pay a certain cost-share amount for prescription drugs with the knowledge and intent that patients would in fact be charged a higher amount; (b) the misrepresentation of the amount of the cost-sharing payment owed under the Plan terms when a patient purchased a drug; (c) the failure to disclose that a material portion of the "copayments" were not "co-" payments at all, but were unlawful Overcharges; (d) the failure to disclose that prescription drug payments under deductible portions of health insurance Plans were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language; and (e) the failure to disclose that coinsurance payments were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language.

81.     On information and belief, some pharmacists were willing participants in the foregoing scheme while they were allowed to retain the Overcharges. However, once Defendants began "clawing back" the Overcharges (rather than allowing pharmacists to retain it), some pharmacists began attempting to alert customers to the existence of the Overcharges and Clawbacks. Defendants affirmatively blocked pharmacists from

disclosing the existence of the Overcharges and Clawback scheme and from selling

prescription drugs directly to customers for a lower price.

82.     For example, according to Doug Hoey ("Hoey") of the National Community

Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from

OptumRx. Hoey stated that the letter from OptumRx " scolded the pharmacist," stating

that OptumRx had "'recently discovered that pharmacy advised members that utilizing a

cash price for their prescription is a better deal than using their insurance benefits.' "[19]

OptumRx further stated in the letter that "telling customers a cheaper price exists is a

'violation of the agreement,' [with ] Optum," that OptumRx 'takes these matters very

seriously[,]' and that 'failure to timely comply with this notice could result in further

disciplinary action, up to and including termination from all Optum pharmacy

networks.' " *Id.*

83.     Indeed, a June 28, 2016 press release issued by the NCPA described the

"Clawback" practice and how it was impacting pharmacists and consumers throughout the

United States.[20] The press release went on to discuss a survey that was conducted by the

NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

---

[19] *See* Lee Zurik, As United overcharges customers, execs earn tens of millions in stock, FOX8LIVE.COM (July 18, 2016, 11:10 PM),
http://www.fox8live.com/story/32472327/zurikasUnitedoverchargescustomersexecsearntensofmillionsinstock (last visited July 26, 2018).

[20] News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited July 26, 2018); *see also* Survey of Community Pharmacies, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited July 26, 2018).

- "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

- Two-thirds (67 percent) said the practice is limited to certain PBMs.

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes insurance companies and PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan. In other words, the patient has to affirmatively ask about pricing. Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the preceding month.[21]

84.     Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

***

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

***

---

[21] *Id.*

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

\*\*\*

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[22]

85.     Clearly, these examples of Overcharges could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of network termination from disclosing the lower cash price for these drugs.

86.     Clawback programs are becoming more and more commonplace in the insurance industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits."[23]

87.     Lawmakers, customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency, rendering it difficult to assess whether a plan is being administered in compliance with plan or contract terms.[24]

88.     Potential waste and abuse in the administration of these Plans has not gone unnoticed by the Department of Labor—which has the authority to enforce ERISA. In

---

[22] *See* Community pharmacists describe PBM copay clawbacks on patients, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited July 26, 2018).
[23] Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.
[24] National Community Pharmacists Association, Lawmakers Ask Medicare for More Drug Payment Transparency (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

89.     At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback' " which takes advantage of the lack of transparency in the PBM industry According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy. The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug. The entire prescription is paid for by the patient. Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "spread" paid for by the patient.[25]

### The Fox 8 Investigation

90.     The New Orleans television station FOX 8 investigated "Clawbacks" as part of its Medical Waste investigative series. FOX 8's investigative reporter, Lee Zurik, found that insurance companies were "charging co-pays that exceed the customers' costs for the drug," and that insurers were "clawing back" the excess payments from the customers.

91.     FOX 8 published a number of screenshots from a pharmacist's computer system showing, with respect to particular drugs, the amount of the payment that certain insurer/administrators (including Defendants) required pharmacists to collect from customers and the amount the pharmacists were required to pay to the health insurer/administrators as a "Clawback."

---

[25] Hayes, supra note 26 at 7.

92.     As part of its investigation, Mr. Zurik requested comment from Defendants. Notwithstanding the specific provisions in the contract Defendants imposed on pharmacies that barred pharmacists from disclosing the existence of the Overcharges to customers (as detailed above), Defendants' representative falsely claimed that "we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions:"

> **From:** Burns, Matthew A <matt_burns@uhc.com>
> **Sent:** Friday, July 22, 2016 8:46 PM
> **To:** Zurik, Lee
> **Subject:** RE: Part D story
>
> Attribute to me:
>
> Our goal is to help our members get the lowest available price for their prescriptions. Often the lowest price is their plan copay, other times it's our contracted rate with the pharmacy, and sometimes it's the pharmacy's own retail or discount price. Our plans offer members security and peace of mind, and we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions.

93.     An OptumRx representative further stated to Mr. Zurik, falsely, that OptumRx ensures that "the customer pays the lowest amount possible within their plan" and that "there is no new charge for the consumer as a result of" Defendants' Overcharge and Clawback scheme, ignoring that the underlying Overcharges violated the Plan language and was illegal:

> **From:**       Stearns, Matthew H <matt.stearns@optum.com>
> **Sent:**       Thursday, May 05, 2016 8:51 PM
> **To:**         Zurik, Lee
> **Subject:**    RE: From Optum
>
> Hey – last thing, to be clear: this program ensures the customer pays the lowest amount possible within their plan – there is no new charge for the consumer as a result of this program.

94.     The OptumRx representative also claimed that the Clawback "does not accrue to [OptumRx's] bottom line:"

**From:** Stearns, Matthew H [mailto:matt.stearns@optum.com]
**Sent:** Thursday, May 05, 2016 8:31 PM
**To:** Zurik, Lee <lzurik@fox8live.com>
**Subject:** RE: From Optum

Thanks, Lee. Key point here is that this does not accrue to our bottom line.

On information and belief, this statement was false.

95.     In response to the disclosure of the "Clawback" practice, Louisiana Insurance Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more than the drug is worth, it's not a copay — it's a 'you-pay.'"

96.     FOX 8 also found that pharmacists were required to charge customers the amount dictated by the insurer or PBM and were not allowed to give any discounts. According to Randal Johnson, President and CEO of the Louisiana Independent Pharmacies Association, "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance."

97.     As a result of their deleterious impact on consumers, many states have now outlawed the Overcharges, Clawbacks, and/or "gag" clauses alleged herein.

**Overcharges Are Most Common With Widely Used Drugs**

98.     Defendants impose Overcharges and Clawbacks most frequently on widely used, low-cost drugs, and particularly generic drugs, where the cost of the drug is relatively low. This enables Defendants to impose deductible costs, copayments, and coinsurance costs that are higher than (or not based on) the cost of the drug, thereby

- 35 -

insuring for themselves a Clawback. These drugs include, but are not limited to the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Chlorzoxazon, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Ergocalciferol, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1

gm), Sotalol HCL, Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep,

Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine,

Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin,

Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir,

Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra,

Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Rule 23(b)(1), (2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the

following Classes:

> **ERISA Class**. All participants or beneficiaries who are or were enrolled in a
> health benefit plan issued and/or administered by Defendants or their
> affiliates or insured under Defendants' or their affiliates' health insurance
> policies and subject to ERISA, who purchased one or more prescription
> drugs pursuant to such plan and paid a cost-sharing amount for such drug(s)
> that exceeded the applicable Negotiated Price.

> **Non-ERISA Class**. All participants or beneficiaries who are or were enrolled in a
> health benefit plan issued and/or administered by Defendants or their affiliates or
> insured under Defendants or their affiliates' health insurance policies and not
> subject to ERISA, who purchased one or more prescription drugs pursuant to such
> plan and paid a cost-sharing amount for such drug(s) that exceeded the applicable
> Negotiated Price.

100.    Excluded from the Classes are Defendants, any of their parent companies,

subsidiaries, and/or affiliates, their officers, directors, legal representatives, and

employees, any co-conspirators, all governmental entities, and any judge, justice, or

judicial officer presiding over this matter.

101.    Plaintiffs reserve the right to redefine the Classes prior to certification.

102.    **Class Period**. Plaintiffs will seek to certify Classes and to recover benefits due to the Class Members and enforce their rights under the terms of the Plans during the longest period permissible under law, including applicable fraud or concealment tolling provisions, and the doctrine of equitable tolling. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent of Defendants' scheme, the length of its concealment, and the time period during which Overcharges took place.

103.    This action is brought, and may properly be maintained, as a class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

104.    The Classes are so numerous that the individual joinder of all of their members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Members is in the thousands and that the members of the Classes are geographically dispersed across the United States. While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

105.    Plaintiffs' claims are typical of the claims of the Class Members because Plaintiffs' claims, and the Class Members' claims, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all Class Members are similarly affected by Defendants' wrongful conduct.

106.    There are questions of law and fact common to the Classes and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit Overcharges, including Spread amounts, to it and thereby overcharged subscribers for prescription drugs;

(b)    Whether the members of the Class have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, and/or damages, and/or unjust enrichment;

(c)    Whether benefits are due to the Class Members under the terms of their Plans;

(d)    Whether Class Members' rights under the terms of their Plans were violated;

(e)    Whether Defendants have violated the state laws invoked here; and

(f)    Whether the Class Members are entitled to declaratory and/or injunctive relief.

107.    Plaintiffs will fairly and adequately represent the Classes and have retained counsel experienced and competent in the prosecution of class action litigation. Plaintiffs have no interests antagonistic to those of other Class Members. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

109.    Class action status in this action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

110.    Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by Class Members would create a risk of establishing incompatible standards of conduct for Defendants.

111.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class as a whole.

112.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other

available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable.

113.    Plaintiffs reserve the right to invoke any provision of Rule 23 appropriate at the time Plaintiffs move to certify the Classes or otherwise address class certification issues.

## PLAINTIFFS AND THE CLASS ARE ENTITLED TO TOLLING DUE TO FRAUD OR CONCEALMENT

114.    By its nature, Defendants' Overcharge and Clawback Scheme has hidden Defendants' unlawful conduct from injured parties.

115.    Neither Plaintiffs nor the Class Members knew of the Overcharge and Clawback Scheme, nor could they have reasonably discovered the existence of the Overcharge and Clawback Scheme, until recently.

116.    Until recent news broke about Defendants' Overcharge and Clawback Scheme, their unlawful conduct was hidden from Plaintiffs and Class Members.

117.    Even today, the gag clauses in place between Defendants and providers continue to hide Defendants' unlawful conduct from Class Members. Even after the media began reporting about the scheme, as set forth above, Defendants and OptumRx made false and misleading statements about the scheme in order to continue its concealment.

118.    To the extent that any of the causes of action alleged herein are subject to a specific statute of limitations or repose, Defendants' fraud or concealment alleged herein tolls those requirements, for a specific amount of time to be determined as the litigation progresses.

119.    The Overcharge and Clawback Scheme—by its nature a secret endeavor by Defendants—remains hidden from most Class Members. Moreover, during the Class Period, as defined above, Defendants actively and effectively concealed their participation in the Overcharge and Clawback Scheme from Plaintiffs and other Class Members through "gag clauses," secrecy policies, material omissions, and false and misleading public statements. There is no question that Plaintiffs' claims are timely.

## COUNT I

### For Violations of ERISA § 502(a)(1)(B)29 U.S.C. § 1132(a)(1)(B) by Plaintiff Sohmer on behalf of the ERISA Class

120.    Plaintiff Sohmer incorporates by reference each and every allegation above as if set forth fully herein.

121.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to recover benefits due under the terms of the Plan, to enforce rights under the terms of the Plan, or to clarify her rights to future benefits under the terms of the Plan.

122.    As set forth above, as a result of being overcharged for prescription drugs, Plaintiff Sohmer and the ERISA Class have been and likely will continue to be denied their benefits and their rights under the Plans to be charged a lower amount for their prescription drugs.

123.    Plaintiff Sohmer and the ERISA Class have been damaged in the amount of the Overcharges, including Spread. Plaintiff Sohmer and the ERISA Class are entitled to recover the amounts they have been overcharged.

124.    Plaintiff Sohmer and the ERISA Class are entitled to enforce their rights under the terms of the Plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)    That they have been overcharged;

(b)    For a declaration that they have a right under the ERISA Plans to pay no more for prescription drugs than the Plans specify;

(c)    For a readjudication of claims;

(d)    For payment of all amounts due to them in accordance with their rights under the ERISA Plans;

(e)    For a calculation and disgorgement of Defendants' profits from the Overcharge scheme; and

(f)    For an order enjoining future Overcharges and Clawbacks or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

### Breach of Contract
### by Plaintiff Fellgren on behalf of the Non-ERISA Class

125.    Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

126.    Defendants offered, sold, and administered health insurance plans and ASO services in all 50 states during the Class Period alleged herein. Certain of these Plans are not subject to ERISA, including Plans that are not sponsored by employers and employer-

sponsored Plans that fall within exemptions from ERISA, such as the exemption for governmental plans provided by ERISA § 4(b)(1), 29 U.S.C. § 1003(b)(1).

127.    These Plans constitute contracts under the laws of each of the states in which they were sold and administered, and in all material respects for this action, these Plans are uniform contracts.

128.    The definitions of the terms used in the Non-ERISA Class Members' Plans are materially the same, including, but not limited to, the definitions of the policy terms such as: "Allowed Amount," "Deductible," "Benefits," "Co-payment," "Co-insurance," "Covered Health Services," "Eligible Expenses," "Pharmaceutical Product(s)," "Premium," "Prescription Drug Charge," "Prescription Drug Product," and "Usual and Customary Charge."

129.    Plaintiff Fellgren and the Non-ERISA Class Members are participants in the Plans that Defendants offered and administered and are either parties to or third-party beneficiaries of such Plans.

130.    Defendants breached the Plans in each of the fifty states by requiring participants and beneficiaries to pay fees for prescription drugs in excess of the fees authorized in the Plans, including Overcharges and Spread, as alleged herein, and in taking Clawbacks.

131.    Plaintiff Fellgren and the Non-ERISA Class Members have suffered damages as result of Defendants' breaches.

132.    Plaintiff Fellgren and the Non-ERISA Class Members are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT III

### Breach of Covenant of Good Faith and Fair Dealing
### by Plaintiff Fellgren on behalf of the Non-ERISA Class

133.    Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

134.    All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff Fellgren's and the Non-ERISA Class Members' contracts with Defendants.

135.    Plaintiff Fellgren and the Non-ERISA Class s members purchased the benefits under the Plans that Defendants offered and administered, and they are either parties to, or third-party beneficiaries of, such health benefit plans.

136.    Defendants performance under the Plans deprived Plaintiff Fellgren and the Non-ERISA Class Members of the prescription drug prices that a reasonable consumer would expect to receive under the Plans.

137.    On information and belief, Defendants' actions, as alleged herein, were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize Defendants' and/or its agents' revenue at the expense of Plaintiff Fellgren and the Non-ERISA Class Members in contravention of the reasonable expectations of Plaintiff Fellgren and the Non-ERISA Class Members.

138.    Defendants have breached the covenant of good faith and fair dealing in the Plans as alleged herein.

139.    Plaintiff Fellgren and the Non-ERISA Class Members have sustained damages as a result of Defendants' breaches as alleged herein.

## COUNT IV

**Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.43, *et seq.*, by Plaintiff Fellgren on behalf of the Non-ERISA Class**

140.    Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

141.    Plaintiff Fellgren brings this claim individually and on behalf of members of the Non-ERISA Class under Minnesota law.

142.    Plaintiff Fellgren purchased health insurance and paid copayments for prescription drugs for her own personal use.

143.    The acts and practices of Defendants as described above deceived Plaintiff Fellgren and members of the Non-ERISA Class as described herein, and have resulted, and will result in, damages to Plaintiff Fellgren and the Non-ERISA Class.

144.    MUDTPA provides that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: [. . .] advertises goods or services with intent not to sell them as advertised" and "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subd.1(9), (13).

145.    By committing the acts alleged above, Defendants have violated the MUDTPA.

146.    Plaintiff and the Non-ERISA Class Members suffered injuries caused by Defendants' misrepresentations by misrepresenting the true cost of prescription drugs and misrepresenting the true amount of a patient's copayment or coinsurance obligation.

147.    Defendants intentionally and knowingly misrepresented material facts regarding the cost of Plaintiff Fellgren's and Non-ERISA Class Members' prescription medications, fees charged to Plaintiff Fellgren and the Non-ERISA Class Members as a component of their copayment or coinsurance obligation, and the true amount of a patient's copayment or coinsurance obligation with intent to mislead Plaintiff Fellgren and the Non-ERISA Class.

148.    Defendants knew or should have known that their conduct violated the MUDTPA.

149.    Defendants owed Plaintiff Fellgren and the Non-ERISA Class a duty to disclose, truthfully, all the facts concerning the true cost of their prescription medications, the true amount of their copay, and any fees charged to Plaintiff Fellgren and the Non-ERISA Class.

150.    Defendants' misrepresentations were material to Plaintiff Fellgren and members of the Non-ERISA Class. Specifically, Defendants misrepresented to Plaintiff Fellgren and members of the Non-ERISA Class that they would pay the lesser of the price of a prescription drug, or the applicable copay when, in fact, they were, in many cases, charged a copay that was greater than the full price of the price of drug as a result of a hidden Clawback fee.

151.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive and reasonable consumers, including Plaintiff Fellgren and Non-ERISA Class Members, regarding the cost of Plaintiff Fellgren and Non-ERISA Class Members' prescription medications, fees charged to them as a component of their copayment or coinsurance obligation, and the true amount of a patient's copayment or coinsurance obligation with intent to mislead Plaintiff Fellgren and the Non-ERISA Class.

152.    In accordance with Minn. Stat. § 325D.45, Plaintiff seeks an order: (1) enjoining Defendants from continuing to conduct business through their fraudulent conduct; (2) requiring Defendants to conduct a corrective advertising campaign; and (3) awarding Plaintiff Fellgren and the Non-ERISA Class costs, including reasonable attorney's fees.

## COUNT V

### Unjust Enrichment
### by Plaintiff Fellgren on behalf of the Non-ERISA Class

153.    Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

154.    To the detriment of Plaintiff Fellgren and the Non-ERISA Class Members, Defendants have been, and continue to be, unjustly enriched by requiring their insureds to pay fees for prescription drugs in excess of the fees authorized in the policies, as alleged herein.

155.    Defendants have unjustly benefited through the unlawful and/or wrongful collection of deductibles, copayments, and/or coinsurance payments that are based on fees

that exceed the actual fees that Defendants or their agents paid to pharmacies for prescription drugs.

156.    The amount of unjust enrichment is the difference between the fees paid for prescription drugs by the insured and fees actually paid by Defendants or their agents to the pharmacy for the prescription drugs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, pray for relief as follows as applicable for the particular claim:

A.    Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Classes;

B.    Finding that Defendants violated the Plan terms;

C.    Finding that Defendants withheld benefits from Plaintiffs and Class Members or violated Plaintiffs' and the Class Members' rights under the Plans;

D.    Enjoining Defendants from further such violations;

E.    Finding that Plaintiff Sohmer and the ERISA Class are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

F.    Awarding Plaintiffs and the Classes damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

G.    Ordering Defendants to restore all losses to Plaintiff Sohmer and the ERISA Class and disgorge unjust profits and/or other assets of the ERISA Plans;

H.    Awarding Plaintiffs and the Classes equitable relief to the extent permitted by the above claims;

I.    Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

J.    Awarding Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

K.    Finding that Defendants are jointly and severally liable for all claims; and

L.    Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: November 15, 2018                    Respectfully submitted,

                                            *s/Daniel E. Gustafson*
                                            Daniel E. Gustafson (#202241)
                                            Amanda M. Williams (#341691)
                                            David A. Goodwin (#386715)
                                            GUSTAFSON GLUEK PLLC
                                            Canadian Pacific Plaza
                                            120 South 6th Street, Suite 2600
                                            Minneapolis, MN 55402
                                            Telephone: (612) 333-8844
                                            dgustafson@gustafsongluek.com
                                            awilliams@gustafsongluek.com
                                            dgoodwin@gustafsongluek.com

Robert A. Izard
Craig A. Raabe
Christopher M. Barrett
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: 860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold
Mathew Jasinski
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860-882-1681
Facsimile: 860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Derek W. Loeser
Gretchen S. Obrist
Matthew Gerend
Garrett Heilman
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206-623-1900
Facsimile: 206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com
mgerend@kellerrohrback.com
gheilman@kellerrohrback.com

Joseph P. Guglielmo
Carey Alexander
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor

New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite
SCOTT+SCOTT, ATTORNEYS AT
LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
ecomite@scott-scott.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
Facsimile: 516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

**Attorneys for Plaintiffs**